UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MONICA WINKELMAN, <br><br> Plaintiff, <br><br> v. <br><br> CONTINENTAL NURSING AND REHABILITATION CENTER, LLC and INFINITY HEALTHCARE MANAGEMENT OF ILLINOIS, LLC, <br><br> Defendants. | No. 20 CV 2480 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Monica Winkelman, a healthcare administrator, was diagnosed with kidney failure and needed time off for surgery and dialysis training. She alleges her employers, Continental Nursing and Rehabilitation Center, LLC and Infinity Healthcare Management of Illinois, LLC violated her rights under the Americans with Disabilities Act and Illinois Human Rights Act. The defendants' motion to dismiss is granted in part, denied in part.

**I.  Legal Standard**

A complaint must contain a short and plain statement that plausibly suggests the violation of a legal right. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–58 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009). At the motion to dismiss stage, I accept the plaintiff's factual allegations as true and draw all reasonable inferences in her favor, but do not accept bare assertions, conclusory statements, or legal conclusions. *Iqbal* at 678–79.

## II. Facts

Infinity Healthcare Management of Illinois manages and operates nursing and rehabilitation centers. [1] ¶¶ 6–7.[1] Infinity hired Monica Winkelman as an administrator of one of its facilities. [1] ¶ 7. About two months later, the company transferred Winkelman to the Continental Nursing and Rehabilitation Center. [1] ¶ 7. Continental and Infinity were owned by the same individuals and operated as an integrated enterprise. [1] ¶ 6. Continental issued Winkelman's paychecks, while Infinity supervised and assessed her work, and oversaw her title, responsibilities, compensation, and employment status. [1] ¶ 8. Winkelman's boss was a regional director at Infinity. [1] ¶ 8.

For a while, Winkelman enjoyed success as an administrator, the highest-level employee at Continental. [1] ¶¶ 8–9. She quickly increased the number of patients at the facility. [1] ¶ 9. She consistently met expectations. [1] ¶ 9. After a year, she received a positive performance review and a merit-based raise. [1] ¶ 9. About three months later, Winkelman was diagnosed with end-stage renal disease, which meant a loss of normal kidney function, including blood filtration. [1] ¶ 10. Winkelman told her boss and a HR representative about her diagnosis and explained that she needed one week off for surgery and recovery, and after that, at some point, two additional weeks for dialysis training. [1] ¶ 11.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of documents.

Winkelman formally requested these accommodations under the ADA. [1] ¶ 12. The next day, Winkelman's requests were approved and senior leadership arrived at the facility. [1] ¶¶ 12–14. Infinity's CEO and COO rarely visited, and Winkelman's boss, a regional director, visited on a weekly basis. [1] ¶ 14. But after Winkelman's accommodation request was approved, the CEO, COO, and her boss were at Continental every day until early June. [1] ¶ 14. They micromanaged staff and imposed unreasonable demands, causing two managers quit and two other employees to seek jobs elsewhere. [1] ¶¶ 13, 15. During this time period, Winkelman took her first one-week leave of absence for surgery and recovery. [1] ¶ 16.

In mid-June, Winkelman confirmed the dates of her dialysis training for her second approved absence with her boss and the HR representative. [1] ¶ 17. The next day, Winkelman's boss and another regional director terminated Winkelman. [1] ¶ 18. They told her the decision was not performance-related, describing Winkelman as someone with "great experience, knowledge, and skills," and offered to write her "excellent letters of recommendation." [1] ¶ 18. They did not explain why Winkelman was terminated. [1] ¶ 18.

Later that year, Winkelman filed EEOC charges against Infinity and Continental, alleging disability discrimination, failure to accommodate, and retaliation. [1] ¶¶ 19–20. The EEOC issued right-to-sue notices, which Winkelman sent to the Illinois Department of Human Rights. [1] ¶¶ 21–22. The IDHR has yet to issue a final decision. [1] ¶ 22. Winkelman filed this lawsuit, alleging failure-to-

accommodate, discrimination, and retaliation claims under the Americans with Disabilities Act and Illinois Human Rights Act. [1].

## III. Analysis

The ADA prohibits disability discrimination in employment, and the failure to reasobably accommodate a disability is one type of discrimination under the act. 42 U.S.C. § 12112(a), (b). To state a failure-to-accommodate claim, a plaintiff must allege that 1) she was a qualified individual with a disability; 2) her employer was aware of her disability; and 3) the employer failed to reasonably accommodate her disability. *See Youngman v. Peoria County*, 947 F.3d 1037, 1042 (7th Cir. 2020); 42 U.S.C. § 12112(b)(5)(A). Defendants argue that Winkelman was not disabled or a qualified individual.

Under the ADA, a "disability" includes "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). "Disability" should be construed in favor of broad coverage, and the term "substantially limits" should not demand extensive analysis. 42 U.S.C. § 12102(4)(A), (B); 29 C.F.R. 1630.2(j)(1)(i).[2] A late-stage disease that allows waste to accumulate in blood and requires surgery and dialysis, [1] ¶¶ 10–11, plausibly suggests substantial limitations to Winkelman's ability to care for herself and perform manual tasks, as well as substantial limitations to her immune system, digestive track, and circulatory system. *See* 42. U.S.C. § 12102(2)(A), (B) (listing

---

[2] EEOC regulations interpreting the ADA are entitled to deference. *See Richardson v. Chicago Transit Authority*, 926 F.3d 881, 887 (7th Cir. 2019).

4

major life activities and bodily functions); *see also* Stedman's Medical Dictionary 842740 (end stage is "the late, fully developed phase of a disease; *e.g.*, in end-stage renal disease, a shrunken and scarred kidney") (West 2014). Winkelman's diagnosis was serious enough that she doesn't need to provide more facts about the condition, nature, or duration of her limitations at the pleading stage. *See* 29 C.F.R. 1630, App. § 1630.2(j)(4) ("someone with end-stage renal disease is substantially limited in kidney function, and it thus is not necessary to consider the burdens that dialysis treatment imposes").³ Winkelman plausibly alleges an actual impairment. *See* 42 U.S.C. § 12102(1)(A). For the short time period between Winkelman's post-surgery recovery and second leave of absence, she sufficiently alleges substantial limitations to major bodily functions because she still required dialysis training. *See id.* By then, Winkelman also had a "record" of impairment because her recent medical history established a substantial limitation in the past. *See* 42 U.S.C. § 12102(1)(B); 29 C.F.R. 1630, App. § 1630.2(k) (individuals should not be discriminated against because of a history of disability, and a record of impairment is satisfied where evidence establishes that the individual has had a substantially limiting impairment). Winkelman adequately alleges a disability under the ADA.

A "qualified individual" is one who has the requisite qualifications to perform the essential functions of her job, with or without reasonable accommodation, at the

---

³ After the ADA was amended, the regulations retained the concept of "condition, manner, or duration," but no longer included the additional list of "substantial limitation" factors from the old regulations, including the nature and severity of the impairment (which defendants argue Winkelman must show). 29 C.F.R. 1630, App. § 1630.2(j)(4).

time of the employment decision. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); 29 C.F.R. 1630, App. § 1630.2(m). While Winkelman does not list the essential functions of a nursing and rehabilitation facility administrator, she alleges enough facts to permit a reasonable inference that she was qualified: she increased the facility's patient population, consistently met expectations, received a positive annual review, a merit-based raise, and was not terminated because of her performance. [1] ¶¶ 9, 18. Even her boss acknowledged her skills and expertise. [1] ¶ 18. *See Iqbal*, 556 U.S. at 678–79 (all reasonable inferences must be drawn in the plaintiff's favor). Winkelman also plausibly alleges she was able to perform the essential functions of her job with reasonable accommodations—the two, short leaves-of-absence she requested under the ADA. [1] ¶ 12. Presumably, Winkelman could not work during this time, so someone else needed to cover for her, or she completed enough work in advance to meet her job responsibilities. Leave is a form of reasonable accommodation. *See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, 2002 WL 31994335, at *14 (October 2002);[4] 29 C.F.R. 1630, App. § 1630.2(o) (reasonable accommodations "could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment"); *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("a brief period of leave to deal with a medical condition could be a

---

[4] EEOC interpretive guidance reflects "a body of experience and informed judgment to which courts and litigants may properly resort for guidance" and is entitled to a measure of respect, which is less deferential than the standard for implementing regulations. *Richardson v. Chicago Transit Authority*, 926 F.3d 881, 889 (7th Cir. 2019) (internal citations and quotations omitted).

reasonable accommodation in some circumstances," unlike a long-term leave of absence) (citing *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)).[5] The one- and two-weeks of leave Winkelman requested are more analogous to a part-time or modified work schedule than an extended leave of absence. *See Severson*, 872 F.3d at 481. Defendants also approved Winkelman's requests, [1] ¶ 12, suggesting they too thought Winkelman was able to perform the essential functions of an administrator with these accommodations before and after surgery. Winkelman thus provides more factual context for being a qualified individual than the conclusory, formulaic allegations defendants cite to for comparison.[6] Winkelman's failure-to-accommodate claim survives defendants' motion to dismiss.

So does Winkelman's discrimination claim. To state a claim for discrimination, Winkelman must allege that 1) she was disabled; 2) she was qualified to perform the essential functions of her job with or without reasonable accommodation; and 3) that her disability was the "but for" cause of the adverse employment action. *See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). For the reasons discussed above, Winkelman plausibly alleges the first two elements of her discrimination claim. As for causation, Winkelman alleges that she had been successfully working

---

[5] According to EEOC guidance, "[a]n employer does not have to provide paid leave beyond that which is provided to similarly-situated employees. Employers should allow an employee with a disability to exhaust accrued paid leave first and then provide unpaid leave." *See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, 2002 WL 31994335, at *14 (October 2002). In other words, the ADA, like the FMLA, does not require employers to give paid leave.

[6] Winkelman is not required to provide documentary evidence at the pleading stage—only a "short and plain statement" that plausibly suggests the pleader is entitled to relief is required. *See* Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 556–58; *Iqbal*, 556 U.S. at 677–80.

as a healthcare administrator for over a year, but that everything changed after she disclosed her medical condition. [1] ¶¶ 7, 9, 12. Leadership swarmed into her facility, causing employees to leave. [1] ¶ 14–15. The day after confirming the dates of her second leave of absence, she was fired for reasons unrelated to performance. [1] ¶¶ 17–18. This plausibly suggests that, by process of elimination, Winkelman's disability was the sole factor in her removal. Prior to her ADA requests, her job did not appear to be at risk—she was performing well and her employer agreed to provide two leaves of absence. [1] ¶¶ 8–9, 12. Discovery may prove otherwise, but that moment of proof is for a later stage in the case.

Winkelman's final claim for retaliation under the ADA requires a plausible suggestion that she suffered an adverse action solely because she engaged in statutorily protected activity. *See Kotaska v. Federal Express Corporation*, 966 F.3d 624, 632 (7th Cir. 2020). About one month after her accommodation requests were approved, Winkelman confirmed the dates of her second leave of absence with her boss. [1] ¶ 17. *See Preddie v. Bartholomew Consolidated School Corp.*, 799 F.3d 806, 814 (7th Cir. 2015) (requesting accommodations under the ADA is statutorily protected activity). The next day, her boss fired her. [1] ¶ 18. *See Koty v. DuPage County, Illinois*, 900 F.3d 515, 520 (7th Cir. 2018) (adverse retaliatory actions are ones that would dissuade a reasonable employee from engaging in protected activity, like termination of employment). While temporal proximity, standing alone, is usually insufficient to establish causation, "[o]ccasionally … an adverse action comes so close on the heels of a protected act that an inference of causation is sensible."

*Milligan v. Board of Trustees of Southern Illinois University*, 686 F.3d 378, 389 (7th Cir. 2012) (internal citations and quotations omitted). Here, Winkelman's boss knew about Winkelman's protected activity and fired Winkelman the next day. [1] ¶¶ 17–18. Moreover, the complaint alleges more than suspicious timing, because it alleges that the decision was unrelated to Winkelman's performance. [1] ¶ 18. The close timing (24 hours or less), incomplete explanation, and unusual behavior of leadership, which started the day Winkelman's requests were approved, are suspicious enough to plausibly suggest but-for causation at the pleading stage. Winkelman's retaliation claim survives defendants' motion to dismiss.[7]

Winkelman alleges the same three claims under the Illinois Human Rights Act. Under state law, "any party seeking to pursue a civil-rights claim in Illinois must first exhaust administrative remedies available under the Act (by filing a claim with the [Illinois Human Rights Commission] and proceeding with an IHRC investigation and adjudication)." *Garcia v. Vill. of Mount Prospect*, 360 F.3d 630, 640 (7th Cir. 2004); 775 ILCS § 5/8-111(D). Defendants raise a failure-to-exhaust argument, an affirmative defense, for the first time in their reply brief. Because the "reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court," defendants forfeit their argument. *See Gyorgy v. C.I.R.*, 779 F.3d 466, 472 n.4 (quoting *U.S. v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996)). However, a district court

---

[7] Winkelman's retaliation claim is not duplicative of her failure-to-accommodate claim. While some of the facts overlap, she alleges two separate legal theories and sufficiently alleges the elements of each claim. According to Winkelman, defendants failed to accommodate her second leave of absence, and terminated her in retaliation for seeking an accommodation. Plaintiffs are allowed to plead alternative theories. *See* Fed. R. Civ. P. (8)(d)(2).

9

may, *sua sponte*, dismiss a complaint for failure to exhaust if it is obvious from the complaint. *See Walker v. Thompson*, 288 F.3d 1005, 1009–10 (7th Cir. 2002) (internal citations omitted). Winkelman has yet to receive a right-to-sue letter from the Illinois Department of Human Rights. [1] ¶ 22; [21] at 2. Consequently, dismissal is warranted. 775 ILCS § 5/8-111(B)(1) (a complainant may only obtain judicial review of a final order); *Garcia*, 360 F.3d at 640. However, dismissal for failure to exhaust is without prejudice and does not bar reinstatement of the suit. *See Walker*, 288 F.3d at 1010.[8]

---

[8] Winkelman's state-law claims are analyzed under the same framework as the ADA. *See Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659 (7th Cir. 2013); *Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill.2d 172, 178–79 (1989) (adopting Title VII framework for IHRA cases); *Luckett v. Human Rights Comm'n*, 210 Ill.App.3d 169, 180–81 (1st Dist. 1989) ("When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims."). Consequently, defendants will not be prejudiced if Winkelman is able to obtain a final order from the IDHR and add her state-law claims before the merits of her federal claims are decided—the scope of discovery and proof will be the same.

## IV. Conclusion

The defendants' motion to dismiss, [13], is denied in part, granted in part. Winkelman's claims under the ADA survive, while her state-law claims are dismissed without prejudice. Defendants shall file an answer to the complaint by October 19, 2020, and the parties shall file an updated status report with a proposed discovery schedule by October 19, 2020.

ENTER:

                                                  Manish S. Shah
                                                  United States District Judge

Date: September 28, 2020